**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
JAMES TEPPER and           :
ALLISON TEPPER,            :
                          :
        Plaintiffs,       :
                          :    CIVIL ACTION
     v.                    :
                          :    NO. 15-cv-5834
AMOS FINANCIAL, LLC,       :
                          :
        Defendant.        :
```

## DECISION

**Joyner, J.**                                    **August 9, 2017**

This action, which Plaintiffs brought pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, was tried non-jury before the undersigned on April 5, 2017. The parties have submitted their proposed factual findings and legal conclusions and the matter is now ripe for adjudication. Having carefully considered all of the evidence, we now make the following:

## FINDINGS OF FACT

1.  Plaintiff James Tepper ("Mr. Tepper") is an adult individual and citizen of the Commonwealth of Pennsylvania residing at 2111 Spring Garden Street, Philadelphia, Pennsylvania.  (N.T. 4/5/17, at p. 7).

2.  Plaintiff Allison Tepper ("Ms. Tepper") is an adult individual and citizen of the Commonwealth of Pennsylvania also residing at 2111 Spring Garden Street, Philadelphia,

Pennsylvania.  Ms. Tepper is married to Mr. Tepper.  Id.

3.  Plaintiffs own the home at 2111 Spring Garden Street
(the "Tepper Residence").  Id.

4.  Defendant Amos Financial, LLC ("Amos") is a limited
liability company existing and operating under the laws of the
State of Illinois, having an office and principal place of
business at 3330 Skokie Valley Road, Suite 301, Highland Park,
Illinois.  (Plaintiffs' Complaint ("Compl."), Doc. No. 1, at ¶ 2;
Defendant's Answer, Doc. No. 3, at ¶ 2).  Amos is exclusively in
the business of acquiring and servicing non-performing and semi-
performing consumer and commercial loans.  (N.T., 4/5/17, at p.
135).  Amos first registered to do business in Pennsylvania on
October 25, 2015.  Pl. Ex. 31.

5.  On November 27, 2009, the Plaintiffs entered into a home
equity line of credit (the "Tepper Loan") with NOVA Bank by
executing the Credit Agreement and Disclosure (the "Credit
Agreement").  (Credit Agreement, Plaintiffs' Exhibit ("Pl. Ex.")
1; Joint Pretrial Memorandum, Doc. No. 24, at pp. 1-2).  The
purpose of the Tepper Loan was for personal, family, and
household purposes or personal investment purposes.  The Tepper
Loan was secured by a mortgage (the "Mortgage") on the Tepper
Residence.  (Doc. No. 24, at pp. 2, 10).

6.  The Credit Agreement provides for a variable interest
rate with a floor and a ceiling, based on an index published in

2

the Wall Street Journal or, if such an index were to become
unavailable, a different index chosen by NOVA Bank.  Id.  The
Credit Agreement requires the Teppers to make minimum monthly
payments in the amount of the interest accrued for each month.
Id.  The method of calculating minimum monthly payments under the
Credit Agreement is based on the outstanding daily principal,
number of days in a given month, advances made to the Plaintiffs,
and payments made by the Plaintiffs.  Id.  If the Plaintiffs make
a payment in excess of the minimum monthly payment, such excess
would be applied to the Tepper Loan principal.  Id.  All unpaid
Tepper Loan principal would have to be paid in one balloon
payment upon maturity of the Tepper Loan.  Id.

7.  The Credit Agreement provides for the possibility of an
increase to the interest rate:

> Rate Increase.  In addition to our other rights during
> termination and acceleration, we may increase the
> variable ANNUAL PERCENTAGE RATE under this Agreement to
> 5.000 percentage points over the then applicable ANNUAL
> PERCENTAGE RATE.  The ANNUAL PERCENTAGE RATE will not
> exceed the maximum rate permitted by applicable law.
> If we do not increase the ANNUAL PERCENTAGE RATE upon
> termination or acceleration of your Credit Line
> Account, it will continue at the variable rate in
> effect as of the date of termination or acceleration of
> your Credit Line Account.

(Pl. Ex. 1).

8.  The Credit Agreement makes multiple references to
"periodic statements" and "statement cycle."  (Doc. No. 24, at
pp. 2, 10).  For example, with regard to checks provided to the

Plaintiffs by NOVA Bank under the Credit Agreement, and the Plaintiffs' use of such checks, the Credit Agreement states: "We may choose not to return NOVA BANK Credit Line Checks along with your periodic statements; however, your use of each NOVA BANK Credit Line Check will be reflected on your periodic statement as a credit advance." Id. With regard to calculating finance charges, which are the minimum monthly payments under the Credit Agreement, the Credit Agreement provides the following method:

> A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "average daily balance" method. To get the average daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid FINANCE CHARGES. This gives us a daily balance. Then, we add up all the daily balances for the statement cycle and divide the total by the number of days in the statement cycle. This gives us the "average daily balance."

(Doc. No. 24, at pp. 2-3, 10). The Credit Agreement specifically provides that "your [the Plaintiffs'] most current periodic statement is the best evidence of your [the Plaintiffs'] obligation to pay." Id.

9. The Plaintiffs began receiving monthly statements from NOVA Bank after the execution of the Credit Agreement. (N.T. 4/5/17, at p. 12). The monthly statements sent by NOVA Bank to the Plaintiffs provided the details regarding the Tepper Loan, such as the principal amount of the Tepper Loan, the minimum monthly payment due, the interest rate used to calculate the

minimum monthly payment, the changes to the interest rate during the month, the number of days during which the applicable interest rate was used to calculate the minimum monthly payment, any amounts past due, and any late charges. See id. at pp. 12-13; Pl. Ex. 8.

10. During the time period when NOVA Bank serviced the Tepper Loan, the minimum monthly payments differed from month to month. (N.T. 4/5/17, at p. 18). Plaintiffs sometimes made monthly payment in an amount greater than the minimum monthly payment. Id.; Pl. Ex. 7. Pursuant to the Credit Agreement, the amounts of the monthly payments made by the Teppers in excess of the minimum monthly payment amounts were applied to the Tepper Loan principal.

11. On October 26, 2012, the Pennsylvania Department of Banking and Securities closed NOVA Bank, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for NOVA Bank. (Doc. No. 24, at pp. 3, 11).

12. After NOVA Bank's closure, the Plaintiffs stopped receiving monthly statements regarding the Tepper Loan. (N.T. 4/5/17, at p. 14).

13. FDIC sent the Plaintiffs two letters informing them of NOVA Bank's closure, FDIC's role as receiver, and FDIC's intention to market and sell all of NOVA Bank's assets, including the Tepper Loan. Id. at pp. 19-20; Pl. Exs. 9-10.

14. Sometime after being contacted by FDIC, Mr. Tepper mailed a check to FDIC for the amount of the last monthly payment sent to NOVA Bank. (N.T., 4/5/17, at pp. 23-25). That check was neither cashed nor returned. Id. at p. 24.

15. In lieu of sending further payments, Plaintiffs thereafter waited for their next periodic statement, which Mr. Tepper believed would be forthcoming from whatever bank acquired the Tepper Loan out of the FDIC receivership. Id.

16. On January 16, 2013, FDIC declared the Tepper Loan to be in default. Pl. Ex. 11. FDIC sent Mr. Tepper a letter informing him that the Tepper Loan was in default. Id.

17. On March 28, 2013, Amos purchased the Tepper Loan by exercising a Bill of Sale for a loan package containing the Tepper Loan. See Pl. Exs. 4-5. The Mortgage securing the Tepper Loan was likewise assigned by FDIC to Amos. See Pl. Ex. 6; Doc. No. 24, at pp. 4, 11.

18. At the time of the purchase, Amos considered the Tepper Loan to be in default. (Doc. No. 24, p. at 19).

19. By letter dated March 28, 2013, FDIC informed Mr. Tepper that the service of the Tepper Loan was being transferred from FDIC as Receiver for NOVA Bank to Amos effective April 12, 2013. Id. at 27; Pl. Ex. 12 (the "FDIC Assignment Letter"). The FDIC Assignment Letter provided contact information for Amos and instructed that all payments on the Tepper Loan would need to be

sent to Amos.  Pl. Ex. 12.

20.  No information regarding principal, accrued interest, or applicable interest rate was provided in the FDIC Assignment Letter.  <u>See</u> Pl. Ex. 12.

21.  On June 5, 2013, Amos sent a letter to the Plaintiffs (the "First Amos Letter"), wherein Amos provided the following information regarding the Tepper Loan:

> The records of [NOVA] Bank indicate that you executed and delivered to the Bank a Credit Agreement and Disclosure (the "Credit Agreement") dated November 27, 2009, in the principal amount of $150,000.00 (the "Loan") Amos Financial LLC is now the owner and holder of the Credit Agreement and the Loan, also identified by the Loan Number 75000710-6.
> . . .
> Your loan is presently past due. Pursuant to the terms of the Credit Agreement your regular monthly payment is equal to amount of your accrued finance charges.  As of May 10, 2013, your loan had $3,897.25 in accrued finance charges. The amount necessary bring [sic] your loan current through May 10, 2013 is **$3,897.25**. This amount **<u>does not</u>** include the next regularly scheduled monthly payment of **$573.73** which is due on June 10, 2013. Thereafter your regular monthly payments will be due on the 10th of each month. Please continue to make regular monthly payments of $573.73 until you are notified by us that the interest rate and the amount of your regular monthly payments have changed.

(Pl. Ex. 13) (emphasis in original).

22.  On July 24, 2013, Amos sent another letter (the "Second Amos Letter"), wherein Amos provided only the following information regarding the Tepper Loan:

> In a letter dated June 5, 2013 you received notice that your account was delinquent and that you were required to pay $3,897.25 to bring your account current through 5/10/13.  We never received the payment of $3,897.25. We also have not received your monthly payments of

$573.73 that were due on June 10, 2013, and July 10, 2013.  Your failure to pay the Credit Agreement within its terms constitutes a default under the Credit Agreement and Loan Documents.  In order to bring your account current **though July 10, 2013**, you need to mail us a check for **$5,044.71**.  If you fail to bring your account current within 30 days of the date of this letter, we will declare your loan to be in default.  If we declare a default, then your interest rate under the loan will increase by an additional 5% to 9.49% pursuant to the terms of the Credit Agreement, and we reserve the right to exercise any other remedies under the terms of the Credit Agreement or applicable law. We urge you to give this matter your immediate attention. Please contact us at your earliest convenience to let us know when we will receive payment and the amount you will be sending.

(Pl. Ex. 14) (emphasis in original).

23.  On September 20, 2013, Amos sent yet another letter to the Plaintiffs (the "Third Amos Letter"), wherein Amos provided the following information regarding the Tepper Loan:

The records of [NOVA] Bank indicate that you executed and delivered to the Bank a Credit Agreement and Disclosure (the "Credit Agreement") dated November 27, 2009, with a revolving credit line in the principal amount of $150,000.00 (the "Credit Line").  Amos Financial LLC is now the owner and holder of the Credit Agreement and the Credit Line, also identified by the Loan Number 75000710-6.
. . .
In a letter dated July 24,2013 you received notice from Amos Financial LLC that if you failed to bring your account current within 30 days, that Amos Financial LLC would declare your loan to be in default, and that your interest rate under the loan would increase by an additional 5% to 9.49% pursuant to the terms of the Credit Agreement.  Your failure to pay the Credit Agreement within its terms constitutes a default under the Credit Agreement, the Credit Line and the Loan Documents.  <u>You are hereby notified that Amos Financial LLC has declared your loan to be in default and that your interest rate under the loan has increased by an additional 5% to 9.49% effective as of the date of this letter.</u>

8

(Pl. Ex. 15) (emphasis in original).

24.   Sometime in November of 2014, the Plaintiffs received
from Amos an Act 91 Notice, which stated that the Plaintiffs had
not made monthly payments on the Mortgage since November 2012,
the Mortgage was in default, Amos intended to foreclose on the
Tepper Residence, and the amount purportedly past due was
"$22,445.99." (Doc. No. 24, at p. 19; Pl. Ex. 16).

25.   After receiving the Act 91 Notice, Mr. Tepper contacted
local counsel for Amos by telephone and by letter dated November
28, 2014, in which Mr. Tepper requested itemized statements of
account relative to the Tepper Loan.  (Doc. No. 24, at p. 19; Pl.
Ex. 33).

26.   Amos local counsel informed Amos of Mr. Tepper's
request for itemized statements of account.  (Doc. No. 24, at p.
19).  However, Amos has never generated itemized statements of
account relative to the Tepper Loan and accordingly has never
provided them to the Plaintiffs.   Id.

27.   On January 12, 2015, a fire occurred at the Tepper
Residence.  (N.T., 4/5/17, at pp. 19, 174).  As a result, the
house was completely gutted and rebuilt, predominantly at the
expense of Plaintiffs' homeowner's insurer.   Id. at p. 19.
Plaintiffs, along with their two children, were forced to
relocate to a significantly smaller apartment, where they resided
for roughly 18 months.   Id. at pp. 169-71.

28.   On March 26, 2015, Amos commenced a foreclosure action

against the Plaintiffs in the Court of Common Pleas of
Philadelphia County, Pennsylvania (the "Foreclosure Action") by
filing a Complaint in Mortgage Foreclosure. <u>See</u> Pl. Ex. 17; Doc.
No. 24, at 19.

29.  The Plaintiffs have retained counsel to defend
themselves in the Foreclosure Action.  (Doc. No. 24, at 19).

30.  On April 6, 2015, Mr. Tepper called Amos and requested
two years of itemized statements of account relative to the
Tepper Loan. <u>Id.</u> at 20.

31.  At the time of the phone call, Mr. Tepper wanted Amos
to "understand that I'm going through something, sort of like to
humanize this thing and just say, 'Hey, I'm dealing with
something.  Let's just give me a statement.  Let's get this over
with.  I'm dealing with a lot here.'" (N.T., 4/5/17, at p. 62).

32.  In particular, Mr. Tepper wanted Amos to understand
that he was having difficulties in dealing with his insurance
carrier in rebuilding his home as a result of the fire. <u>Id.</u> at
61-63.

33.  Later on April 6, 2015, Mr. Tepper received a return
phone call from Nareg Korogluyan ("Mr. Korogluyan").  (N.T.,
4/5/17, at p. 47).  Mr. Korogluyan is the operations officer for
Amos and he is second in command in Amos' management hierarchy.
<u>Id.</u> at pp. 113-14.

34.  The Parties disagree about what transpired on the April
6, 2015 phone call between Mr. Tepper and Mr. Korogluyan.  Mr.

Tepper testified that he began the phone call by saying, "Hey, Jim Tepper, how are you?  I got this letter."  <u>Id.</u> at p. 50.  Mr. Tepper testified that he then "explained the house, and wanted to see what was going on."  <u>Id.</u>  Mr. Tepper testified that Mr. Korogluyan responded with a "little yelling and screaming" and that, during the course of the phone call, Mr. Korogluyan made the following statements:

- "We're foreclosing.  We're foreclosing."

- "You don't deserve statements.  You don't deserve statements.  We're foreclosing."

- "I don't care about your family."

- "This is our house.  You don't deserve your house.  You didn't pay your loan.  You don't pay your car, your car is ours, not ours.  You don't pay your house.  I don't care about your family.  That's up to you."

- "That's your problem.  You didn't pay.  You don't deserve a statement."

- "You don't deserve it.  Your house is mine.  Your house is ours.  We're taking your house.  There is nothing you can do.  You can't do anything."

- "You don't pay your car.  Your car is ours."

- "You don't need to know [how the amount due was calculated].  That's our business.  You didn't pay.  You owe."

- "I'm going to take your house.  Your house is mine."

<u>Id.</u> at pp. 50-54, 59.  Mr. Tepper further testified that the conversation was "was like around and around and around" and "like 30 to 40 minutes" in duration.  <u>Id.</u> at pp. 50, 52.

35.  Mr. Korogluyan testified that he remembers having a

telephone conversation with Mr. Tepper around April of 2015 "when there was a fire in the home and he had called asking for two years of statements and wanting to discuss what he needed to do to kind of –- I think it was kind of around insurance proceeds and signing off on checks and whatnot." Id. at p. 146.

36.  Mr. Korogluyan further testified that "it didn't stand out as a conversation" and "at the time, there was nothing extraordinary about it.  Obviously, there was an event.  The home fire, that was extraordinary.  But as far as our conversation, there was nothing that, you know, I recall that was extraordinary." Id. at p. 147.

37.  Mr. Korogluyan also testified that he disagrees with Mr. Tepper's characterization of the phone call and that he "did not make any threats." Id. at p. 146.  Mr. Korogluyan did not keep any notes of the phone call. Id. at pp. 148-49.

38.  Ms. Tepper testified that she remembers the day of Mr. Tepper's phone conversation with Mr. Korogluyan. Id. at p. 164. Ms. Tepper testified that, after the phone call, her husband was "like beside himself.  He was just blown away that he wasn't able to get anywhere with the conversation that he had just had with this person.  He was just blown away." Id.

39.  The Court finds by a preponderance of the evidence that Mr. Korogluyan made statements in the April 6, 2015 phone call substantially similar to those described by Mr. Tepper in his testimony.  In making this finding we consider it significant

that Mr. Korogluyan never testified that any of the specific statements ascribed to him by Mr. Tepper are inaccurate. See, e.g., Defendant's Proposed Findings of Fact and Conclusions of Law, Doc. No. 40, at ¶ 29 ("Mr. Korogluyan is certain that he made no threatening statements to Mr. Tepper during their telephonic conversation on April 6, 2015.").

40. On April 8, 2015, John Carroll, on behalf of Amos, sent Mr. Tepper an email ("Amos Email"). (Doc. No. 24, at p. 20). In its entirety, the Amos Email stated:

> Dear James Tepper:
>
> I am writing to follow up on your request to our office on 4/6/15 for an updated reinstatement amount. I have attached to this email the Act 91 Notice that you previously received. For your reference the reinstatement amount that was included in the Act 91 Notice is on page 4 of the pdf.
>
> Pursuant to your request, I am providing you with an updated reinstatement amount through 4/10/15. Your reinstatement amount through 4/10/15 is $29,132.06 which consists of $28,390.58 in interest, and $741.48 in legal fees and costs. If you intend to reinstate your loan then please contact us for wiring instructions. Please send me a reply email to confirm that you received this email.
>
> Sincerely,

(Pl. Ex. 18).

41. Mr. Tepper testified that the April 6, 2015 phone call "set me into probably the deepest depression, the deepest anything I can ever imagine going through in my life." (N.T., 4/5/17, at p. 51). Ms. Tepper also testified that her husband's attitude changed after the telephone call. In particular, Ms.

13

Tepper testified that Mr. Tepper "stopped sleeping," "wasn't looking good," "wasn't as active as he had been," and "didn't want to go out." Id. at p. 165. She also testified that in the wake of the April 6, 2015 phone call Mr. Tepper became less reliable and began drinking more. Id. at pp. 166-67.

42. Soon after the April 6, 2015 phone call, Mr. Tepper was prescribed Ambien CR as a sleep aid. Id. at p. 58.

43. In the months following the April 6 phone call and the Amos Email, Mr. Tepper's career suffered. At all relevant times Mr. Tepper has worked as an independent contractor who represents vendors that wish to appear on QVC.[1] (N.T., 4/5/17, at p. 8). In the wake of his phone call with Mr. Korogluyan, Mr. Tepper testified that as a result of his emotional distress he missed QVC airings and failed to follow through on calls and emails. Id. at 63-64.

44. In 2015, Mr. Tepper's income was $291,300. Id. at 68; Pl. Ex. 30. In 2016, his income dropped to $158,850. (N.T., 4/5/17, at 68; Pl. Ex. 29). Mr. Tepper testified that the $132,450 difference in income year over year is the result of speaking with Mr. Korogluyan and his other contacts with Amos in 2015. (N.T., 4/5/17, at 68).

---

[1] "QVC" stands for "Quality, Value and Convenience" and refers to live merchandise-focused televised shopping programs marketed and sold by QVC, Inc., a multimedia retailer whose principal executive offices are located in West Chester, Pennsylvania. See QVC, Inc., Annual Report (Form 10-K)(Feb. 28, 2017). We take judicial notice of this information pursuant to Fed. R. Evid. 201.

45.    Mr. Tepper also testified that his home life suffered. He testified that he missed out on time with his family and that he needed a tutor to do homework with his child, because he was not present.  Id. at 65.

46.    Although it is clear that Mr. Tepper's income in 2016 fell far short of his income in 2015, the Court finds that Plaintiffs have failed to demonstrate by a preponderance of the evidence that any harm suffered (financial or otherwise) is a result of Amos's actions, as distinct from Plaintiffs' unrelated financial troubles and other difficulties.

47.    The Court further finds that Mr. Tepper, being an educated businessman, had the ability to make a significant living while dealing with various life obstacles, including the January 2015 fire that occurred at the Tepper residence, as well as managing a stressful and demanding job.  Finally, the Court finds that the Teppers' testimony relating to the personal trauma experienced by Mr. Tepper as it pertains to his phone call with Mr. Korogluyan is not credible.

## DISCUSSION

The FDCPA was enacted in 1977 in order "to protect consumers from a host of unfair, harassing, and deceptive collection practices without imposing unnecessary restrictions on ethical debt collectors."  F.T.C. v. Check Investors, Inc., 502 F.3d 159, 165 (3d Cir. 2007) (citations omitted), abrogated on other

grounds by <u>Henson v. Santander Consumer USA Inc.</u>, 137 S.Ct. 1718 (2017). "The primary goal of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices, including threats of violence, use of obscene language, certain contacts with acquaintances of the consumer, late night phone calls, and simulated legal process." <u>Id.</u> (citation omitted). "A basic tenet of the Act is that all consumers, even those who have mismanaged their financial affairs resulting in default on their debt, deserve the right to be treated in a reasonable and civil manner." <u>Id.</u> (citation omitted). In order to carry out its purposes, "the FDCPA enlists the efforts of sophisticated consumers as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others." <u>Jensen v. Pressler & Pressler</u>, 791 F.3d 413, 419 (3d Cir. 2015) (alteration and citation omitted).

"In the most general terms, the FDCPA prohibits a debt collector from using certain enumerated collection methods to collect a 'debt' from a consumer." <u>Check Investors</u>, 502 F.3d at 166 (alteration and citation omitted). In order for the FDCPA's protections to apply, "two threshold requirements must be satisfied. First, the person or entity engaging in the prohibited practice must be a 'debt collector' within the meaning

of the statute." <u>McDermott v. Nationstar Mortg., LLC</u>, 143 F.

Supp. 3d 290, 296 (E.D. Pa. 2015) (citing <u>Pollice v. Nat'l Tax</u>

<u>Funding, L.P.</u>, 225 F.3d 379, 403 (3d Cir. 2000). "Second, the

prohibited practice must have been used in an attempt to collect

on a 'debt.'" <u>Id.</u> (citing <u>Pollice</u>, 225 F.3d at 400).

### A. FDCPA Applies to Amos and the Tepper Loan

As a threshold matter, we must determine whether the FDCPA

applies to Amos and the Tepper Loan at all. For if Amos is not a

debt collector, or if the Tepper Loan is not a debt, Plaintiff

can have no FDCPA claim however objectionable Defendant's conduct

may be. We write in the wake of the Supreme Court's opinion in

<u>Henson v. Santander Consumer USA Inc.</u>, 137 S.Ct. 1718 (2017),

which was decided after the bench trial was held in this case and

which upended Third Circuit law that both parties had relied on.

This Court thereafter ordered additional briefing regarding Amos'

status as a "debt collector" in light of <u>Henson</u>, which the

parties duly provided. (Doc. Nos. 47-49).

Following the Supreme Court's lead, "we begin, as we must,

with a careful examination of the statutory text." <u>Henson</u>, 137

S.Ct. at 1721. In relevant part, the FDCPA tells us that:

> The term "debt collector" means any person who uses any
> instrumentality of interstate commerce or the mails in
> any business the principal purpose of which is the
> collection of any debts, or who regularly collects or
> attempts to collect, directly or indirectly, debts owed
> or due or asserted to be owed or due another.

15 U.S.C. § 1692a. In other words, the statute provides two

possible paths for a plaintiff to prove that a particular defendant is a "debt collector."  Subject to certain exceptions not relevant here, the defendant will be a debt collector if either (1) its "principal purpose . . . is the collection of any debts," or (2) it "regularly collects or attempts to collect . . . debts owed or due . . . another."  Id.

In Henson, the Court held that an entity that regularly purchases debts originated by a third party and then seeks to collect those debts for its own account is not a "debt collector" under the second statutory definition.  Amos is precisely such an entity, and so Plaintiff's FDCPA claims necessarily fail to the extent Plaintiff seeks to rely on the statutory definition at issue in Henson.  Plaintiff appropriately directs our attention then to the first possible path provided by § 1692a, which the Supreme Court explicitly noted was outside the scope of its review.  See Henson, 137 S.Ct. at 1721.  And on the first path, Plaintiff's footing is more sure.  While the second definition is limited to "debts owed . . . another," the first definition applies to "*any* debts," provided only that the entity's *principal purpose* is the collection of such debt.  We agree with Plaintiff that the evidence shows that Defendant meets that first definition.  Indeed, any other conclusion is untenable in light of Mr. Korogluyan's testimony that Defendant's business focuses exclusively on acquiring and servicing non-performing and semi-

performing loans.  (N.T., 4/5/17, at p. 135).

We also conclude that the Tepper Loan is a "debt" as defined by statute.  "The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."  15 U.S.C. § 1692a(5).  The parties do not dispute that the purpose of the Tepper Loan was for personal, family, household purposes or personal investment purposes, and the Court has so found.  The Plaintiffs are also clearly "consumers," as defined by Congress at 15 U.S.C. § 1692a(3).  Having crossed all statutory thresholds, Plaintiffs are and were entitled to the FDCPA's protections in their interactions with Amos regarding the Tepper Loan.

### B. Amos Violated § 1692e of the FDCPA

Plaintiffs contend that Defendant committed multiple violations of 15 U.S.C. § 1692e on account of both its written communications with Plaintiffs and the April 6, 2015 phone call between Mr. Tepper and Mr. Korogluyan.  That provision governs false or misleading representations.  In relevant part, it states:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following

19

conduct is a violation of this section:
. . .
(2) The false representation of--(A) the character,
amount, or legal status of any debt;
. . .
(5) The threat to take any action that cannot legally
be taken or that is not intended to be taken.
. . .
(10) The use of any false representation or deceptive
means to collect or attempt to collect any debt or to
obtain information concerning a consumer.

15 U.S.C.A. § 1692e.  The FDCPA is a remedial statute, and so

courts are instructed to "construe its language broadly, so as to

effect its purpose."  Brown v. Card Serv. Ctr., 464 F.3d 450, 453

(3d Cir. 2006).  Any lender-debtor communications should

accordingly "be analyzed from the perspective of the least

sophisticated debtor."  Id. at 454.

"The least sophisticated debtor standard requires more than

'simply examining whether particular language would deceive or

mislead a reasonable debtor' because a communication that would

not deceive or mislead a reasonable debtor might still deceive or

mislead the least sophisticated debtor."  Id. (quoting Wilson v.

Quadramed Corp., 225 F.3d 350, 354 (3d Cir. 2000)).  This lower

standard gives meaning to Congress's intent to protect "all

consumers, the gullible as well as the shrewd, the trusting as

well as the suspicious, from abusive debt collection practices."

Id. (internal quotations omitted).  "However, while the least

sophisticated debtor standard protects naive consumers, 'it also

prevents liability for bizarre or idiosyncratic interpretations

of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.'" Id. (quoting Quadramed, 225 F.3d at 354-55).

Against this backdrop, we now consider each of Defendant's communications with the Plaintiffs regarding the Tepper Loan.

*(1) Written Communications*

Plaintiffs contend that all of Defendant's written communications regarding the Tepper Loan violated § 1692e(2)(A) and § 1692e(10) by, *inter alia*, falsely representing the amount and character of the alleged debt under the Tepper Loan. There are five such communications: (a) the First Amos Letter; (b) the Second Amos Letter; (c) the Third Amos Letter; (d) the Act 91 Notice; and (e) the Amos Email. Defendant responds in part by invoking FDCPA's statute of limitations. An FDCPA claim must be brought "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). Plaintiffs filed their Complaint on October 26, 2015. (Doc. No. 1). Because the First, Second, and Third Amos Letters were all sent more than one year prior to that date, we agree with Defendant that their contents cannot give rise to liability under FDCPA's one-year statute of limitations.[2]

---

[2] Plaintiffs argue that the "continuing violation doctrine" applies because the violations contained in the First, Second, and Third Amos Letters were not discrete isolated acts, but were rather part of a pattern of misrepresentations and deceptive means that extended into the limitations period. (Doc. No. 38). "Under the continuing violation doctrine, when a defendant's conduct is part of a

As to the Act 91 Notice and Amos Email, Plaintiffs argue that both run afoul of § 1692e for failure to properly disclose the amount and character of the alleged debt due under the Tepper Loan.  The Act 91 Notice declares the "TOTAL AMOUNT PAST DUE" to be $22,445.99, and indicates that this amount due is the result of the Teppers' failure to make payments on the Tepper Loan beginning in November 2012 and continuing every month thereafter.  (Pl. Ex. 16).  The Amos Email, sent about four months later, indicates that the "reinstatement amount" is $29,132.06 as of April 10, 2015, which consists of $23,390.58 in interest and $741.48 in legal fees and costs.  (Pl. Ex. 18).  As Plaintiffs note, neither document provides any details on the principal, current interest rate or past interest rate.

Referring to the Third Circuit's "least sophisticated debtor" standard, Plaintiffs argue that the letters violate § 1692e in that they provide only a lump sum of the debt owed without further explanation of how such amount is calculated.  We agree with Plaintiffs that both letters are deficient in this respect.  See <u>Grubb v. Green Tree Servicing, LLC</u>, No. CIV.A.

---

continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."  <u>Snyder v. Baxter Healthcare, Inc.</u>, 393 F. App'x 905, 909 (3d Cir. 2010).  It is not applicable in this case.  Each written contact from Amos regarding the Tepper Loan is different from the last; they are independent events, each to be scrutinized on its own terms.  <u>See Lukawski v. Client Servs., Inc.</u>, No. 3:12-CV-02082, 2013 WL 4647482, at *3 (M.D. Pa. Aug. 29, 2013).

13-07421 FLW, 2014 WL 3696126, at *9 (D.N.J. July 24, 2014)
(declining to dismiss FDCPA claim under where a written letter
provided a lump sum with no further information regarding how the
amount of debt was calculated) (citing <u>Fields v. Wilber Law Firm,
P.C.,</u> 383 F.3d 562 (7th Cir. 2004); <u>Miller v. McCalla, Raymer,
Padrick, Cobb, Nichols, and Clark, L.L.C.</u>, 214 F.3d 872, 875 (7th
Cir. 2000)); <u>Jones v. Midland Funding, LLC</u>, 755 F. Supp. 2d 393,
397 n.4 (D. Conn. 2010) (noting that analysis under §
1692e(2)(A), § 1692e(10), and § 1692g(a)(1) is "essentially the
same").  At trial, Mr. Korogluyan, who has a degree in finance,
struggled to recreate the amount stated in the Amos Email,
eventually arriving at $26,270.41, which represented a 4.49
percent loan interest rate from February 20, 2013 to September
20, 2013, and then a 9.49 percent loan interest rate from
September 20, 2013 through April 8, 2015 and which was $2,861.65
less than the amount stated in the Amos Email.  (N.T., 4/5/17, at
pp. 140-46).

    Nowhere in the Act 91 Notice or Amos Email did Amos offer
any detail as to how the amounts due were calculated, nor did it
disclose in those documents that it was relying on a heightened
interest rate dating back to September 2013.  On this record and
judging both documents from the perspective of the least
sophisticated debtor, we hold that Amos's statements as to the
character and amount of debt owed were so incomplete and

misleading that they amounted to false representations within the meaning of § 1692e(2)(A) and § 1692e(10).

We further conclude that Amos misstated the amount of the debt by relying on a 9.49 percent interest rate, which Amos invoked contrary to the terms of the Credit Agreement. See Pl. Ex. 1. Pursuant to the Credit Agreement, the Lender enjoyed the right to increase the variable annual percentage interest rate only in the event of termination and acceleration. Id. But, at trial, Mr. Korogluyan testified that Amos hiked the interest rate without ever notifying the Teppers that it was terminating and accelerating the Tepper Loan. (N.T., 4/5/17, at pp. 154-57). Amos's misplaced reliance on a heightened interest rate necessarily operates as a false representation of the character, amount and legal status of the Teppers' debt and by itself triggers FDCPA liability.

*(2) April 6, 2015 Phone Call*

Plaintiffs argue that Mr. Korogluyan's statements on the April 6, 2015 phone call amount to a violation of § 1692e(5)'s prohibition on threats to take action that cannot legally be taken or are not intended to be taken, as well as § 1692e(10)'s prohibition on the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. In particular, Plaintiffs allege that Amos violated the statutory provisions when Mr.

24

Korogluyan said that a) the Teppers were not entitled to receive a statement on the Tepper Loan since the Tepper Loan was in default, (b) the Tepper Residence belonged to Amos, and (c) there was nothing the Teppers could do to get the Tepper Residence from Amos.

We agree that Mr. Korogluyan's statements that Amos owned the Tepper Residence and the Teppers' car amounted to false representations or deceptive means in an attempt to collect on a debt. We likewise conclude that Mr. Korogluyan's statement that Mr. Tepper could do nothing to avoid repossession of the Tepper Residence was a false representation or deceptive means, in violation of § 1692e(10).

However, we conclude that Plaintiffs have failed to prove a violation of § 1692e(5). Integral to Plaintiffs' argument on that score is their contention that Amos was not registered to do business in Pennsylvania and thus could not bring a foreclosure action under 15 Pa. C.S.A. §§ 8587(a) and 8981(a). Amos responds that it was not required to register in Pennsylvania in order to collect on debt. (N.T., 4/5/17, at p. 116). Given that Amos eventually registered in Pennsylvania, Pl. Ex. 32, and has in fact brought a foreclosure action against the Teppers in state court, we are unable to conclude that the threats of legal action against the Teppers could not legally be taken or were not intended to be taken. Accordingly, Amos is not liable for any

violation of § 1692e(5).

## C. Damages

In the case of an action brought by an individual, a debt collector who fails to comply with any provision of the FDCPA is liable for:

> (1) any actual damage sustained by such person as a result of such failure;
>
> (2) . . . such additional damages as the court may allow, but not exceeding $1,000; . . . and
>
> (3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

15 U.S.C. § 1692k(a). In determining the amount of liability, we are to consider, among other relevant factors, "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." 15 U.S.C.A. § 1692k(b)(1). Having proven multiple violations of the FDCPA, including some particularly boorish conduct on the part of Mr. Korogluyan, we will award Plaintiffs $1,000 in statutory damages,[3] along with the costs of the action and a reasonable attorney's fee to be determined at a later date. The Court does not, however, find Defendant to be liable for any actual damages as a result of its FDCPA violations.

---

[3] Statutory damages are limited to $1,000 per successful court action, regardless of how many independent violations are proven. See Goodmann v. People's Bank, 209 F. App'x 111, 114 (3d Cir. 2006).

In light of the foregoing, the Court now states the following:

## CONCLUSIONS OF LAW

1.   The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it arises from the Fair Debt Collection Practices Act, a law of the United States.

2.   This Court has jurisdiction over the parties and venue is proper in the Court pursuant to 28 U.S.C. § 1391 in that (a) Defendant has placed telephone calls to Plaintiff in Philadelphia, Pennsylvania attempting to collect a debt; (b) Defendant entered this jurisdiction on March 26, 2015 by filing the Foreclosure Action in the Court of Common Pleas of Philadelphia County.

3.   Plaintiffs have established by a preponderance of the evidence that Defendant violated § 1692e(2)(A) and § 1692e(10) of the Fair Debt Collection Practices Act.

4.   Plaintiffs have failed to establish by a preponderance of the evidence any actual damages resulting from Defendant's violation of the Fair Debt Collection Practices Act.

5.   Plaintiffs are entitled to $1,000 in statutory damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A).

6.   Plaintiffs are entitled to an award of reasonable attorney fees and costs incurred in prosecuting this action, pursuant to 15 U.S.C. § 1692k(a)(3).

An Order of Judgment follows.